Segall, Appellant, *v.* Par Bond & Mortgage Company et al.

Argued November 22, 1934.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Walter C. Longstreth,* for appellant.

*Robert Mair,* and with him *Wayne P. Rambo,* for appellees.

Opinion by Baldrige, J., March 1, 1935:

Pauline Segall filed a bill in equity against the Par Bond & Mortgage Company, hereinafter called mortgage company, and Samuel T. Hall, Inc., hereinafter called Hall, Inc., for an accounting, discovery and recovery of damages alleged to have been sustained through defendants' fraud. An answer was filed, a trial had, and the bill dismissed. Exceptions filed by the plaintiff to the chancellor's decree were dismissed by the court in banc, except No. 32, which was to the chancellor's refusal to allow plaintiff her share of $158.71 received by the mortgage company. The court held that the plaintiff was entitled to recover from the mortgage company $29.83 as her share of that amount, but she was not entitled to recover anything from Hall, Inc. A final decree was entered in accordance with that decision. On the same day, an appeal was taken by plaintiff to No. 297, October Term, 1934, to this court.

On the following day, plaintiff's counsel requested a specific finding of fact as to the value of the garage which was involved in the suit. On July 17, 1934, the

court, in a per curiam opinion, found that the value of the garage, in April, 1930, was $154,272, and with some slight modifications, which are unimportant, dismissed the bill, at plaintiff's costs. Plaintiff took an appeal from this decree, to No. 460, October Term, 1934.

These two appeals will be considered and disposed of in one opinion.

We will not attempt to narrate all the facts involved in this long record. Our reference to them will be as brief as the material questions involved will permit. Nor do we think it necessary to discuss all the numerous assignments of error, although they have received our careful consideration.

The important facts are as follows:

In 1929 the Aiken Realty Company, hereinafter called the realty company, owned a tract of land in Philadelphia, on which were erected a garage, a theatre, an apartment house, and seventeen stores. Over each store were two apartments. Max Brown, father of the plaintiff, was the promoter of this real estate project, and he and appellant's four brothers, trading as Brown & Sons, owned one-half the stock of the realty company. All these properties were subject to a first mortgage and a building and loan second mortgage, and the theatre was subject to a $40,000 third mortgage.

In March, 1929, mortgage interest and taxes were in arrears, and the mortgagees were threatening foreclosure. In an effort to avoid financial disaster, the realty company, on March 16, 1929, entered into a written agreement with the mortgage company, Hall, Inc., and the appellant. Five supplemental agreements were entered into, but they did not alter the portion of the original agreement with which we are concerned. The agreement before us provided for the execution, by the realty company, of a bond, secured by a mortgage, known as the "new mortgage," in

the sum of $80,000, payable within one year from its date, with interest at six per cent. The funds received therefor were to pay pressing claims. This new mortgage was a subsequent lien to the above-mentioned mortgages.

The plaintiff, at the request of her brother, Abraham Brown, advanced $13,000 for her interest in this new mortgage. The mortgage company paid from time to time amounts totalling $61,801.01, which represented its interest in the mortgage.

Clause 4 of the agreement provided as follows:

"(A) If, at any time prior to the maturity of the aforesaid New Mortgage, the rentals and other net receipts hereinbelow provided for are insufficient to pay the 1929 taxes and water rent and the interest, dues and premiums on the aforesaid prior mortgages, the mortgage company shall prevent a foreclosure of any of the mortgages superior in lien to this new third mortgage:

"(1) by advancing the sums needed to pay the aforesaid charges or

"(2) by securing from mortgagees an agreement or promise not to foreclose until the rentals have provided the funds wherewith to pay the aforesaid charges.

"(B) Such advances also shall be secured by this New Mortgage and shall bear interest at the rate of 6% per annum from the date they are advanced."

The agreement provided further that Hall, Inc., was to be the collecting agent for all the properties, and was to pay from the receipts the operating expenses and carrying charges.

The mortgage company did not pay the 1929 taxes on the garage, amounting to $5,137.12, but to prevent foreclosure of the mortgages guaranteed the payment of that amount. On April 29, 1930, which was after the date the new mortgage was payable, the Central

Building and Loan Association foreclosed its second mortgage on the garage. The default alleged was the failure to exhibit the receipt for the 1929 taxes. The garage was sold by the sheriff, and a deed was made therefor to the building and loan association. On July 7, 1930, the mortgage company agreed to purchase the garage from the association, and paid a total amount of $7,500 on account of the purchase price. Possession of the garage was delivered to the mortgage company under a lease on August 1, 1930. The building and loan association, being unable to get a settlement with the mortgage company for the property, cancelled the sale on November 7, 1930, and all further negotiations respecting it ceased.

The plaintiff contends that the mortgage company breached its agreement in not paying the 1929 taxes, thus permitting the building association to institute proceedings of foreclosure on its second mortgage, and, as a result thereof, the mortgage company is indebted to her in the sum of $13,000. The court found that while the mortgage company did not pay the 1929 taxes on the garage in cash, it did prevent a foreclosure on the garage until after the due date of the new mortgage, thereby complying with the clause in the agreement relating to that subject.

Wayne P. Rambo, Esq., attorney for the mortgage company, testified that at the time the question of the payment of the 1929 taxes was being discussed with the plaintiff and her attorney, prior to foreclosure proceedings, the 1930 taxes were due on the garage, and payments on the building and loan association mortgage were three months in arrears. Mr. Rambo advised that, in view of the situation that confronted them, it would be better to have a foreclosure on the building and loan second mortgage to avoid complications that might arise owing to the relation existing between the association and the realty company, and there would be less difficulty in obtaining a clear title.

This witness denied, as contended by the plaintiff, that the foreclosure of the mortgage on the garage was had for the purpose of eliminating plaintiff's interest in the $80,000 mortgage. The evidence disclosed that at one of the several conferences held previous to the sale, the plaintiff was advised that, if she desired, as she had an interest in the mortgage, she could institute foreclosure proceedings, and that after the sale she was informed of the mortgage company's paying to the building and loan association, in its endeavor to acquire title to the property, $7,500 in addition to its investment in the mortgage, in the hope primarily of protecting itself. Mr. Rambo testified that he told Hall that if the sale was completed, plaintiff was entitled to her share in the property.

We do not find sufficient evidence to support appellant's charge that the mortgage company has an interest now in the garage, or that it is guilty of any fraud. It was only endeavoring to preserve a large investment, which it finally completely lost. This unfortunate real estate enterprise, heavily mortgaged, was burdened with large carrying charges with receipts insufficient to pay them. It appears that the loss of the properties was inevitable, due to rapidly declining prices of real estate. This is borne out by subsequent foreclosure proceedings, which resulted in the sale of all but five of the properties, the ones remaining being at the time of the trial in possession of the mortgagees.

We do not accept the contention of the appellant that it was the duty of Hall, Inc., to segregate the income from the garage to meet first the carrying charges against that particular property. The theatre, rather than the garage, was evidently regarded by the parties the most important property to salvage from this sinking concern. Abraham Brown stated it was worth at least $400,000, and was "the key to the situation."

After a careful consideration of all the facts and circumstances relating to the various transactions, we have come to the same conclusion reached by the court below, viz., that the main purpose of the agreement of March 16, 1929, was to prevent any foreclosure proceeding for a year. This was accomplished.

The court in banc, in response to appellant's request to fix the value of the garage, found that its value, in April, 1930, was $154,272. Evidently, this finding was based on the testimony of George R. Weikel, who placed that value thereon. But, in his cross-examination, in answer to the question as to what he meant by a fair market value, he replied: "I mean by fair market value what the property should bring by taking your time and advertising it properly, and trying to contact buyers for that piece of real estate." He stated, in further explanation of this testimony, that he did not mean to say that amount would have been the value at a public sale, and he could not state what the property would have actually sold for. Although it was not sold until July, we think there was not such a decided change in the real estate market in that short time to affect materially its probable value.

The appellant argues that as the first and second mortgage liens amounted to but $142,645.92, there was an equity of $11,626.08 in the new mortgage. We think that conclusion does not necessarily follow. This witness and the court evidently thought that intrinsically the property was worth that amount. But that was not the market value. The fact that shortly after the new mortgage fell due the property sold for an insufficient sum to reach that lien would seem to reflect reasonably its value on the market.

The court, notwithstanding the value it fixed on the garage, affirmed the finding of the chancellor that the share of the appellant in the new mortgage had no value when the property was sold, and, therefore, she

sustained no loss by the sale. Taking into consideration Weikel's testimony, the well-known unfavorable conditions of the real estate market in 1930, and the other circumstances, we are of the opinion that the chancellor was warranted in finding that the new mortgage had, in fact, no value on April 1, 1930.

As a considerable portion of the costs accrued after the filing of this bill, we think it is just and equitable to divide the costs. We, accordingly, direct the plaintiff to pay one-half thereof and the defendants, jointly, to pay the other one-half.

Decree of the lower court, as modified as to costs, is hereby affirmed.